IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 22, 2018 Session

## STATE OF TENNESSEE v. REUBEN EUGENE MITCHELL

**Appeal from the Criminal Court for Knox County**
No. 102034   Steve Sword, Judge

No. E2017-01739-CCA-R3-CD

A Knox County jury convicted the Defendant, Reuben Eugene Mitchell, of arson and filing a false insurance claim valued between $10,000 and $60,000, and the trial court sentenced him to four years of probation. On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions. After review, we conclude that the evidence is insufficient to sustain the Defendant's conviction for filing a false insurance claim, and we vacate the judgment and dismiss that charge. We affirm the Defendant's conviction for arson.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Vacated in Part and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, J., joined. JOHN EVERETT WILLIAMS, P.J., filed a separate opinion concurring in part and dissenting in part.

Joshua Daniel Hedrick, Knoxville, Tennessee, for the appellant, Reuben Eugene Mitchell.

Herbert H. Slatery III, Attorney General and Reporter; Katherine Casseley Redding, Assistant Attorney General; Charme Prater Allen, District Attorney General; and William Charles Bright and Andrea Andrews Kline, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a fire that occurred on December 5, 2011, at a home where the Defendant was living. In relation to this fire, a Knox County grand jury indicted the Defendant on charges of arson and filing a false insurance claim valued over $60,000. At

a trial on the charges, the parties presented the following evidence: David Gray testified that he was a fire adjuster for Allstate Insurance, and he would respond when a customer had a fire in an attempt to determine its cause. The Defendant was one such customer, and Mr. Gray met with the Defendant in in 2011 after receiving a call about a fire loss in the home where the Defendant was living. The home was located on Holmouth Lane in Knox County, Tennessee ("Holmouth House").

Mr. Gray identified several documents, one of which was an agreed order between the Defendant and Bentley Street Christian Church ("BSCC") entered into on October 26, 2011, which stated that the Holmouth House would be sold. The agreement articulated that the Holmouth House had been the subject of litigation between the church and the Defendant. As part of a settlement order, the house was to be sold after the parties agreed on a realtor. The order also required that the Defendant immediately add BSCC as an insured on the existing insurance policy and name BSCC as the mail recipient for any checks collected under that policy. The order further contemplated that the Defendant would pay $100 per month toward back property taxes and that he be permitted to reside at the Holmouth House until it was sold, unless the property had not sold by April 30, 2012, at which time the Defendant would vacate the premises.

The order further stated that, if the property did not sell by the April date, the Clerk and Master would conduct a judicial sale. The proceeds from that sale would be distributed as follows: All back taxes would be paid first; BSCC would be paid $35,000 plus $9,000 in legal fees for a total of $44,000; BSCC would be paid for any inspection expenses or costs; David and Louise Moore would be paid the amount of their judgment lien; the Defendant's legal fees would be paid; and the remaining balance would go to the Defendant.

Mr. Gray identified the Defendant's application for insurance with Allstate Insurance for the Holmouth House. The Defendant applied for a homeowner's policy and requested that the policy be for the Defendant and Joyce Williams with no mention of BSCC. The application also indicated that there were no dogs on the premises. The application stated that the value of the house for insurance purposes was $173,854, the outbuilding was to be insured for $17,385, and the personal property was to be insured for $104,313. The premium on that policy was $2,026.79 per year, with an additional $58 for liability coverage. The application indicated that the home had been purchased in May 2009 for $150,000. The policy was to take effect November, 30, 2011, the same day that the application had been made.

Mr. Gray said that he responded to, on average, seventy calls per year regarding a fire loss and that he generally met with the customer within forty-eight hours of their call reporting the loss. Mr. Gray recalled that the Holmouth House was extensively damaged,

which would have required gutting the living room back to the studs. Mr. Gray talked with the Defendant who said that he had been living in the house and had a fire in the fireplace. Shortly after starting the fire in the fireplace, he had to leave the house, which was when the fire took place.

Mr. Gray said he hired EFI Global, a company that specialized in determining the cause and origin of fires. He said that Gary Young and Marvin Headrick from EFI Global investigated this case, as they had many other fire cases in the past. Mr. Gray stated that these investigators did not always determine that the cause of the fire was arson.

During cross-examination, Mr. Gray testified that an Allstate Agent would have filled out the application for insurance and that the agent would have posed the relevant questions to the Defendant. Mr. Gray was unsure who the agent was in this case, stating that the application only listed the agent's number and not their name. He further said that the agent should have printed out the policy for the Defendant's review. The Defendant's signature was not required on the policy because the Defendant also had an automobile policy in place with Allstate.

Mr. Gray agreed that, while the coverage for the house was $173,854, Allstate would only pay the amount of the loss, not to exceed that amount. Allstate determined that the replacement value of the home was $173,854 for insurance purposes.

Mr. Gray testified that the policy required that the insured provide a signed and sworn proof of loss within sixty days of the loss to be compensated pursuant to the insurance policy. Mr. Gray said that he never personally received such a document. He said that the file indicated that the Defendant received an advance payment of $1,000, but this payment was not something that Mr. Gray was involved in. The documents indicated that the advance was not considered a payment under any portion of the policy. Mr. Gray said that, pursuant to the court order, the proceeds for a total loss would have been paid to BSCC.

During redirect examination, Mr. Gray testified that the application filed and signed by the Defendant listed the Defendant as the beneficiary. According to Mr. Gray, despite the court order, Allstate would have been contractually bound to pay the Defendant, listed as the beneficiary, and not BSCC.

Heather Stover testified that she was an insurance adjuster who handled large losses. She investigated this case and explained that pursuant to the advance payment agreement, her company offered people whom had suffered extensive fire damage to their property an advance payment to cover immediate needs. In the Defendant's case,

3

the company began a cause and origin investigation, and it also determined that there were no salvageable contents of his home. Ms. Stover met the Defendant at Walgreens, his place of employment, on December 9, 2011, to give him the $1,000 advance payment.

Ms. Stover testified that the case was transferred from her to the "Special Investigations Unit" ("SIU") for a more extensive investigation. Normally, a case would be returned from SIU and the claim paid or denied. Ms. Stover said that, at this point, everything had been done to start processing the insurance claim.

During cross-examination, Ms. Stover agreed that the policy stated that the advance payment was not a payment pursuant to any portion of the policy. She then clarified that the payment was issued pursuant to the personal property coverage of the Defendant's policy, explaining "it's an advance payment issued in good faith that [Allstate] will pay the claim." Ms. Stover agreed that Allstate created the form that said that the payment was not considered a payment pursuant to the policy. She further agreed that she never received any documentation from the Defendant, including a signed, sworn proof of loss or a claim form.

During redirect examination, Ms. Stover testified that the policy also read that, if Allstate later determined that the claim was not valid, the insured would repay the advance. She said that, had the claim been paid, Allstate would have transferred an additional $29,000 to the Defendant.

Marvin Wendell Headrick, an employee with EFI Global, testified that he assisted in investigating fires by taking pictures, creating diagrams, and occasionally questioning witnesses. Mr. Headrick recalled that, in 2010 and 2011, his boss, Mr. Young, was in poor health. As a result of this, Mr. Headrick assisted Mr. Young and took a more active role in investigations.

Mr. Headrick recounted participating in the investigation in this case. He took exterior photographs of the house to determine where the fire started, looked for signs of forced entry, took a survey of the interior of the building, and attempted to reconstruct the scene. Mr. Headrick said that he then cleared debris to determine the fire patterns in the house and to determine the cause of the fire.

Mr. Headrick identified Mr. Young's official report on this fire, which the trial court admitted into evidence. The report included an interview Mr. Young conducted with the Defendant. During the interview, the Defendant told Mr. Young that the power was off at the residence, so he started a fire in the fireplace with a starter log and then left to go to his sister's house, ensuring the house was locked before he left. The Defendant said that the only people with keys to the residence were him, his girlfriend, and his

sister. The Defendant said that there should have been no flammable liquids present in the living area at the time of the fire. He reported that he was not a cigarette smoker and that no smokers were in the residence before the fire. He said that his only enemies were members of the church and that one of the deacons had previously been arrested for breaking into the residence. The Defendant opined that a problem with the fireplace caused the fire.

Mr. Headrick said that Mr. Young's report also included photographs. The trial court admitted this report and the accompanying photographs into evidence. The photographs showed that the living room suffered the most fire damage. Mr. Headrick noted that the photographs showed that there was a couch in the living room that suffered extensive fire damage and that sat in front of the fireplace, near which there was also "deep charring" on the floor.

Mr. Headrick identified a white substance on the walls near the fireplace. He said the substance was soot from a "clean burn" and that it initially settled on the brick, and then a high level of flames "impinged" the area so the flames burned the suet back off the brick. This indicated that there was a large amount of flames in the area during the fire. Mr. Headrick said that he found and photographed a "starter log" in the fireplace along with other actual logs. He said that there was still bark on the logs in the fire and that they were blackened from smoke but not heavily charred. The logs, which were "naturally colored," did not appear to have been burning for a sustained period of time or impinged by flame. Some of the paper was still on the starter log, not having been consumed by fire.

Mr. Headrick identified photographs of a chair and ottoman that had been positioned in the right hand corner of the living room. Near them, he also photographed a heater that looked as if it had been plugged into the wall.

Mr. Headrick took samples of wood and fabric, and placed them in cans to be sent to Dennis Akin at AK Analytical for testing. Mr. Headrick created an "evidence transmittal letter" as he was collecting the evidence to document where the evidence was coming from.

Mr. Headrick said he documented all the rooms in the house and that, while there was smoke damage, the fire had not spread beyond the living room area. He noted fire damage to the front door.

During cross-examination, Mr. Headrick agreed that he only took one sample from the floor and did not include samples from other parts of the home not involved in the fire. Mr. Headrick agreed that the widely accepted fire guide, NFPA 921, said that

5

comparison samples should be taken and were especially important in the collection of material believed to contain a liquid or solid accelerant.

Lance Newsome testified that he was a State Farm claim representative and that he wrote estimates on repairs for structural damage, which are normally used to settle a claim. Based upon his qualifications, the trial court declared him an expert for estimating structural damage. Mr. Newsome said that there was a commercial policy on the Holmouth House, which had been purchased and paid for by the BSCC, separate from and unrelated to the Defendant's Allstate insurance policy. His records indicated the house suffered a loss on December 5, 2011, and Mr. Newsome inspected the house on December 30, 2011. Mr. Newsome estimated the damage at $59,015.00 before materials, tax, and contractor's fee. With those amounts included, he estimated the total loss at $72,356.85. Mr. Newsome said that the total amount State Farm paid on the claim was $77,513.61. The amount paid the church was $58,015.00, because Mr. Newsome withheld the $1,000 deductible in accordance with the policy.

William Dennis McCain, a fire captain with the Knoxville Fire Department, testified that he responded to the call about this fire and was first to the scene. He recalled that the front door to the home was locked, so firefighters used a Halligan bar to gain entry into the home. He confirmed that the heaviest part of the fire was inside the home to the right of the front door. After extinguishing the fire, Captain McCain and company searched for people and animals but found none.

Darrell Whitaker, a Captain with the Knoxville Fire Department, testified that he was an arson investigator and investigated this fire. He said that Captain Kincaid was the first investigator on the scene and the lead investigator, but Captain Kincaid called for assistance based upon the weather that evening. Captain Whitaker arrived at around 9:30 p.m., and fire department personnel were still present. They had extinguished the fire but were ensuring that it stayed extinguished. Captain Kincaid and his K-9 officer were also present.

Captain Whitaker testified that he took photographs at the scene, including of the wood in the fireplace, a portion of which was unburned. Captain Whitaker testified that, while the hearth of the fireplace was warm to the touch, the firebrick surrounding the wood portion of the fire was cool to the touch. The captain said that he found notable that the back of the couch was severely damaged as a result of the fire while the front and the arm of the couch were less damaged. This indicated that there was "a lot of fire" on the back of the couch.

Captain Whitaker said that he interviewed the Defendant on December 28, 2011, provided him *Miranda* warnings, and audio recorded the interview. The Defendant told

the captain that the church had given him the Holmouth House in exchange for work that he had done on the church and another property. He began having problems with the church's deacons after the property value of the Holmouth House increased based upon the work he had done on the house. The Defendant said he and his fiancé were seeking financing so that he could make more improvements to the house and that, while he had been turned down when applying alone, he was hopeful to get a loan with her as a co-signatory. The Defendant said that two deacons broke into the house and took some of his possessions, but the Defendant did not call the police because they returned his possessions. After a second incident, however, where they took a realtor sign, the deacons were charged with disturbing the peace. The Defendant told Captain Whitaker that there was no power to the house because his power and water had been shut off in mid-November for nonpayment. He explained that he had been paying his sister's utilities.

During cross-examination, Captain Whitaker testified that the weather the night of the fire was rainy. He further agreed that, while the Defendant had admitted that he was struggling financially, a potential for profit was not proof in and of itself of arson. Captain Whitaker agreed that, pursuant to the court order, the church would have only received a total of $44,000. Because of the fire, the church received $59,000 in insurance proceeds from State Farm, so the church received more than they would have if the house had sold and not been damaged by fire. Captain Whitaker agreed that they had searched the Defendant's car and addresses associated with him, but he said that the search was not related to the arson investigation and officers did not find anything that related to the arson investigation.

Captain Whitaker agreed that the neighbors called the fire department about this fire at 9:30 p.m., but he was unsure how long the fire burned before the call came in. The captain said that the fire burned to at least 800 degrees, as evidenced by the "calcination" of the sheetrock in the home. The captain said that there was evidence that several areas of the carpet were not burned during the fire. Captain Whitaker agreed that the backside of the sofa facing the fireplace was more burned than the front of the sofa facing the room. The captain identified pictures of the house, and he noted that there were two gas cans depicted in a photograph of the garage. The captain agreed that the home was furnished and that there were several televisions and other items in the home on the night of the fire.

During redirect examination, Captain Whitaker testified that law enforcement seized the Defendant's computer during one of their searches. He said that the Defendant, who worked at Walgreens, did not have a reason to use his computer at work. The captain said that, when he went through the Holmouth House, he found evidence that pets lived there, such as dog food and batting for them to sleep on, but the dogs were

7

chained up in the backyard.

Dennis Akin, the owner of AK Analytical, testified as an expert in forensic science, including the forensic chemistry of fire-related materials, that his company was a forensic science consulting laboratory that mainly conducted the analysis of fire-related substances. Mr. Akin testified that he received four, one-gallon metal cans from EFI Global, who was investigating the fire in this case. The items in the containers included: the baseboard under a window of the living room, fire debris and chair material, wood from around the chair, wood flooring under the couch, and rug material. Mr. Akin testified that he tested these items for an identifiable ignitable liquid. The sample of the wood floor under the couch in front of the fireplace in the living room tested positive for containing a highly aromatic medium petroleum distillate characteristic of paint thinners and mineral spirits.

During cross-examination, Mr. Akin agreed that floor stain contained mineral spirits. He agreed that the identifiable ignitable liquid could have been consistent with wood stain. He further agreed that there were no accelerants found on the chair, rug, or baseboard.

During redirect examination, Mr. Akin said that mineral spirits did not remain indefinitely on a material and that the spirits would be present if the stain had been applied a day or two earlier. He further stated that the entire floor, if stained at the same time, would have the presence of mineral spirits and would burn at the same time.

Ed Metts Hardy, with EFI Global, testified as an expert in the origin and cause of fires. Mr. Hardy testified that originally he theorized that there could have been four possible causes of this fire: electricity; anything associated with the space heater; smoking; or an open flame and a flammable liquid like a mineral spirit. Mr. Hardy was able to disprove electricity as the cause because there was no electricity to the house at the time of the fire. He disproved the space heater as the cause because it was away from the main source of the fire. He also disproved the fire being started by smoking because the Defendant indicated he had not been smoking at the time of the fire. The remaining theory was that the fire was set intentionally.

Mr. Hardy tested this theory by examining the scene. He stated that the origin of the fire was located between the fireplace and the back portion of the sofa. Based upon the burn pattern, he determined that there was something that was "holding the flame down on the floor." He opined that this could have been the result of an ignitable fluid. Mr. Hardy identified the irregular burn pattern documented in photographs and said that an ignitable fluid could explain this pattern. He said that, therefore, he collected samples, one of which returned as containing the ignitable fluid of "mineral spirits." Mr. Hardy

explained that mineral spirits were usually in liquid form and that the mineral spirits in this case were in the area where the fire originated.

Mr. Hardy testified that he examined the fireplace, which contained a kerosene soaked log to be used as a fire starter. He said that the logs in the fireplace were not burned. He said that the fire starter log was not burning at a high enough temperature to bring the wood logs to "ignition temperature." Mr. Hardy opined that it was not a spark from the fireplace that caused the fire in this case.

During cross-examination, Mr. Hardy testified that the industry of cause and origin investigation was made more scientific with the advent of NFPA code, which was the industry's standard of care. Mr. Hardy explained the theory of "negative corpus," which included determining that a fire was set by arson when you can exclude accidental causes, and he agreed that such a theory is rarely an acceptable theory. He expounded that there are cases when "negative corpus" does not apply, such as when you can formulate a hypothesis based upon the origin of the fire. Mr. Hardy agreed that he never went to the scene of this fire, but based his findings on the evidence submitted to him. He further agreed that the fire investigation did not occur until seven days after the fire.

Mr. Hardy agreed that most of the area rug near the fire did not burn but that only a portion near the back of the sofa burned. Mr. Hardy agreed that he could not be sure that the mineral spirits were the first item to ignite in the house. He said that the mineral spirits would have to be ignited by a fire source, such as an open flame, a lighter, or a piece of paper on fire. Mr. Hardy agreed that the sample of the rug and baseboard did not contain mineral spirits and that the floor was the only sample that did. He agreed that mineral spirits is a substance consistent with wood stain for floors, but he explained that mineral spirits usually "cure[] out" in about eight to sixteen hours. After the substance was cured, ignitable vapors would not be present.

Mr. Hardy testified that his investigation revealed that there were "trailers" in the burn pattern, meaning points where an ignitable fluid went from point A to point B. He said that there was also an irregular burn pattern. Both of these were consistent with an intentionally set fire. Further consistent with an intentionally set fire was damage inconsistent with the fuel load. He agreed that he did not find an incendiary device, such as a match, but said that he did not expect to find it. He further noted that the finding of an ignitable fluid supported the theory of an intentionally set fire. He agreed that there were other indicators that did not favor an intentionally set fire, such as lack of excessive fire growth, no sabotage to the structure, and no removal or replacement of contents before the fire.

Mr. Hardy agreed that there were no control samples taken of the floor. Mr.

9

Hardy said that his information indicated that all the doors were locked when the fire department arrived.

During redirect examination, Mr. Hardy testified that during the Defendant's interview he told investigators that he, his girlfriend, and his sister were the only ones with keys to the house. The Defendant further stated that he locked the home before he left the evening of the fire. He further told investigators that there should have been no flammable liquids present in the living room and that they all should have been in the basement. The Defendant indicated that he was not a cigarette smoker and that no cigarette smokers were in the residence before the fire. He said that his only enemies were some of the church members from the BSCC and that one of the deacons there had been arrested for breaking into his residence. The Defendant opined that the fire was caused by a problem with the wood burning fireplace.

Ruth Dover, the Defendant's sister, testified that the Defendant helped her pay her utilities, obtain her prescriptions, and supported her financially. She did not grasp the financial repercussions of the Defendant's assistance until she learned that his own electricity had been shut off. Ms. Dover said that the Defendant had difficulties with the church related to the house and was upset about losing his home. Ms. Dover agreed that the Defendant loved his dogs and said that he would not have left them at a burning house.

The Defendant testified that he began living at the Holmouth House as part of an agreement with the church that entailed that he would work on the church and the home of one of the senior elders. At the time the Defendant took possession of the Holmouth House, it was "a week away from being condemned" by the City and in need of repair. The Defendant offered photographs of the Holmouth House before his repairs, saying that he "completely gutted the house," including removing dead animals, carcasses, and feces. The Defendant said that he did all of the repairs himself, which included replacing the drywall, replacing some of the subfloor, and scraping the popcorn ceilings. The Defendant said that the last thing he did in the repairs was to refinish the floors. The Defendant then offered photographs of the Holmouth House after his pre-fire repairs, including before and after pictures of the kitchen repairs.

The Defendant explained that he had put a lot of work and money into the house. After the repairs were completed, he invited members of the church to see the finished product. The church sold him the house for $35,000, and he estimated that it was worth around $80,000 or $90,000 after the repairs were completed. After the church members saw the Holmouth House repaired, they asked for the house back.

The Defendant said that, based upon the church's desire, litigation ensued. The

10

parties came to an agreement under which the Holmouth House would be placed on the market and that the first $44,000 would go to the church and any additional amount would go to the Defendant. The Defendant said that he had expected to receive approximately $36,000 upon the sale of the house. He said that there was another nearby house for sale for $12,000, and he intended to purchase that house and similarly repair it for resale.

The Defendant said that he did not read the agreement or the court order. He operated under the assumption that any money received under any insurance policy would go to the church. The Defendant recounted that, according to the agreement, he did not have to pay rent while he lived in the home, and he could stay in the home until it sold or until April 2012. At the time of the fire, he still had four months left to live in the home rent free. He further said that he was "[v]ery confident" that the house would sell in that time frame.

The Defendant testified that on November 30, 2011, he got a new insurance policy with Allstate on the Holmouth House. The insurance policy that he had prior to the Allstate policy was through Progressive Insurance. Under the Progressive policy, the home was insured for $239,000, and under the Allstate policy the home was insured for $173,000. The Defendant explained that he changed policies because the Allstate policy was "way less expensive" than the Progressive policy.

The Defendant testified about his sister's health around the time of the fire. He said that she had been diagnosed with a rare form of cancer which had a 5% survivability rate. This diagnosis caused her both physical and financial difficulties. The Defendant, who worked at Walgreens at the time, began assisting his sister financially which strained him financially. He paid for her medication which caused him to get behind on his bills. The electric company shut off the electricity to the Holmouth House.

The Defendant explained that he used his fireplace to heat his home. Initially, he had the sofa oriented to face the fireplace, then it would get too hot, so he turned the back of the sofa to the fireplace and the temperature was "perfect." He explained that he kept the sofa close to the fireplace so that he could stay warm. The Defendant said he did not live with his sister because of pride. He had kept from his sister that his electricity had been shut off.

The Defendant testified about the day of the fire, saying that he had worked at Walgreens all day that day. When he got off of work, he got some kindling from a Pilot gas station and a burger from Burger King. The Defendant then went and got jugs of water and went to the Holmouth House. When he got to the house, he let the dogs out and then he started a fire with the kindling and the fire starter log. He placed a "starter

11

gel" on the fire to get it going. The Defendant said that he received a call from his niece who was "hysterical." She said that his sister was "not responding [and] didn't seem to be breathing." The Defendant said he went into "panic mode," and grabbed some wet logs from the back porch and threw them into the fireplace and went out the door. The wet logs appeared to put out the fire, so the Defendant got into his car and left the Holmouth House.

The Defendant said his routine included leaving the back door and the garage door unlocked. The garage door had to be manually rolled up and down because of the lack of electricity, so it was not locked. The Defendant said that he left the Holmouth House in a hurry so he was unsure whether the fire was extinguished, the doors were locked, and he left the dogs outside. The Defendant said he was still in his work clothing when he left the house. He did not take anything with him. In his car was his laptop that he used for school, which he took with him to work since he did not have electricity at home to charge it.

The Defendant said that, when he arrived at his sister's house, the ambulance was there. She was not responsive, and emergency personnel were putting an IV into her arm. The Defendant said that he followed the ambulance to the hospital, and he did not leave the hospital until the next morning. Doctors determined that the Defendant's sister had suffered an allergic reaction to some of the chemotherapy medicine.

The Defendant said that he left the hospital and went home where he found the windows burst out, the AC unit sitting on the driveway, and the burned furniture sitting outside. At first, he thought that someone had broken into his home but then he realized that there had been a fire, so he called the fire department. The Defendant said that he did not set his house on fire and he did not fill out forms with Allstate claiming the loss. The Defendant said that he had called Allstate to report that there had been a fire, but he never filled out a sworn statement, filed a list of property that was lost, or initiated a claim.

During cross-examination, the Defendant testified that he began fixing the Holmouth House in May 2009 and that it took approximately two-and-a-half to three years to complete the renovations. During renovations, the Defendant was a tenant in the house. The Defendant testified that, for a short period of time, between two and four months, another tenant lived in the home.

The Defendant said that he obtained an insurance policy through Progressive for the Holmouth House in August 2011. He said that this was before he and the church engaged in litigation and that, prior to that, the church carried the insurance on the house. The Defendant said that he refinished the floors in November 2011 and that, while it was

12

expensive, he obtained the materials from the Habitat for Humanity store.

The Defendant agreed that he had tried unsuccessfully to get a loan to keep the Holmouth House. He said the church had given him the house in exchange for work he had done, and he did not think they were entitled to have the house back. The Defendant said, however, he was happy with the agreement that he and the church entered into about the house. The Defendant said that he was unaware that the lawyer representing him in the civil case had filed a motion to withdraw as counsel based upon the Defendant's not paying him. The Defendant agreed that he was struggling financially at the time but that he and the elders of the church came to an amicable agreement about selling the house. The Defendant agreed that he did not comply with the agreement that required him to put the church on the insurance policy. He explained that, after the parties entered into this agreement, they went back to the church and had a meeting and prayed. During the meeting, the elders told him that they already had a State Farm Insurance policy on the house and that, since they knew the Defendant was struggling financially, that he did not have to purchase another insurance policy.

The Defendant said that the agreement also included that he would keep the home in showable condition, and he said that this was the reason that he put the final coat of finish on the floors. He listed the Holmouth House with his then fiancé, and then he obtained an insurance policy through Allstate. He said that the new policy cost him "[h]undreds of dollars" less than the Progressive policy.

The Defendant testified that, after the fire, he called Allstate and informed them of the fire and to report the loss. He said he did this with the intent to start the process of filing a claim. The Defendant said Mr. Young called him and told him that he needed to get the Defendant's statement before Allstate filed a claim. The Defendant spoke with him and gave him a statement. He recalled that someone from Allstate met with him and gave him a check for $1,000.

The Defendant said that the position of the couch in relation to the fireplace had not caused him any concern. He said the couch had been in that position for some time, as it was oriented to face the television, when the electricity was on. The Defendant said that he put the final coat of polyurethane on the floors in November before this fire.

The Defendant agreed that, after he got the call about his sister, he tried to put the fire out with some wet logs. He said he did not put the fire screen in front of the fire, in part because its legs were broken. The Defendant said that multiple people had keys to the house, including members of the church. The Defendant agreed that he left the door to his home unlocked, but he said that he had adopted a large, territorial dog, and he felt that took care of the issue.

13

During redirect, the Defendant said that his lawyer's motion to withdraw was entered October 17, 2011, but that his lawyer still represented him at the October 26, 2011, mediation where the Defendant and the church entered into an agreement. The agreement contemplated that they would have a meeting to discuss the purchase price of the Holmouth House. It was at this meeting that he discussed the insurance policy with the elders. The Defendant said that when he was asked about flammable liquids in the living room he assumed the investigator meant gas or gas cans, which he kept downstairs. He was thinking about actual liquids themselves and did not think about old floor stain.

Based upon this evidence, the jury convicted the Defendant of arson and filing a false insurance claim valued between $10,000 and $60,000, and the trial court sentenced him to four years of probation. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions. He first contends that there was no evidence that he filed a false or fraudulent insurance claim because there was no proof that he filed a claim. He next contends that the evidence is insufficient to prove that he committed arson because he was not the only one who stood to gain from the fire, the burn pattern does not prove arson, and the presence of wood stain in a hardwood floor is inconsequential without a control sample.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial

evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## A. Filing a False Insurance Claim

The Defendant contends that the evidence is insufficient to sustain his conviction for filing a false insurance claim valued between $10,000 and $60,000 because there was insufficient proof that he filed a claim. He notes that, pursuant to the insurance policy, in order to file a claim, Allstate required that he report the loss immediately, give a detailed list of the damaged or destroyed property, and sign a sworn proof of loss statement within

sixty days. The Defendant asserts that there was no proof that he gave a detailed list of damaged or destroyed property and that there was no proof that he provided a signed, sworn proof of loss within sixty days. The State counters that the evidence is sufficient to support the conviction because everything was done to start the claims process before it went to the SIU for investigation. It further notes that the Defendant accepted $1,000 pursuant to the insurance policy. We agree with the Defendant.

The statute criminalizing insurance fraud reads:

> Any person who intentionally presents or causes to be presented a false or fraudulent claim, or any proof in support of such claim, for the payment of a loss, or other benefits, upon any contract of insurance coverage, or automobile comprehensive or collision insurance, or certificate of such insurance or prepares, makes or subscribes to a false or fraudulent account, certificate, affidavit or proof of loss, or other documents or writing, with intent that the same may be presented or used in support of such claim, is punished as in the case of theft.

T.C.A. § 39-14-133 (2014).

The Defendant legally, and under the policy, did not initiate a claim because he did not file the necessary and required documentation pursuant to the policy, including a proof of loss, in the requisite time period. In past cases, the Tennessee Court of Appeals has affirmed the denial of a claim where the insureds did not comply with the requisite contractual agreements. That Court has stated:

> It is established that notice provisions of an insurance policy are valid conditions precedent to coverage, and in the absence of notice as required no coverage is afforded even though (1) the policy does not contain a forfeiture claim, and (2) the insurer had not been prejudiced by the delay in notice.

*Tennessee Farmers Mut. Ins. Co. v. Nee*, 643 S.W.2d 673, 675 (Tenn. Ct. App. 1982). In fact, Allstate has relied upon these provisions to deny coverage to insureds who did not comply with the notice provisions. *Allstate Ins. Co. v. Wilson*, 856 S.W.2d 706, 709 (Tenn. Ct. App. 1992).

The insurance policy in the case under submission required:

**3. What You Must Do After a Loss**
In the event of a loss to any property that may be covered by this policy, **you** must:

a) immediately give **us** or **our** agent notice. . . . .
. . . .

g) within 60 days after the loss, give **us** a signed, sworn proof of the loss. This statement must include the following information:
1) the date, time, location and cause of the loss;
2) the interest **insured persons** and others have in the property, including any encumbrances;
3) the actual cash value and amount of loss for each item damaged, destroyed or stolen;
4) any other insurance that may cover the loss;
5) any changes in title, use, occupancy or possession of the property that have occurred during the policy period;
6) at **our** request, the specifications of any damaged **building structure** or other structure; . . . .

(emphasis in original). The policy goes on to state: "**We** have no duty to provide coverage under this section if **you**, an **insured person**, or a representative of either fail to comply with items a) through g) above, and this failure to comply is prejudicial to **us.**"

We conclude that the Defendant in this case did not meet the conditions precedent to filing a claim. While the Defendant made Allstate aware that there had been a fire, he did not file any documentation to support his filing of a claim or for the initiation of a claim. Further, he did not comply with the requirements for filing a claim because he did not file a proof of loss. For the same reasons that Allstate could have denied the Defendant coverage for not adequately filing a claim, we conclude that the evidence is insufficient to support that he fraudulently filed an insurance claim against Allstate.

Further, while it is true that Allstate advanced the Defendant $1,000 in good faith, the agreement signed by both the parties clearly states that "if it is determined that any part of the policy or the claim is not valid, and no payment is due, [the Defendant] will repay the advance to [Allstate] in full." By the plain language of the agreement the $1,000 is an advance, and not part of the coverage pursuant to the policy. The contract signed by the parties gives Allstate the right to pursue the return of the $1,000 in the event that the Defendant is not entitled to coverage under the policy.

Because we have determined that the evidence is insufficient to support the Defendant's conviction for false or fraudulent insurance claim, we reverse that conviction and dismiss the charge. The trial court sentenced the Defendant to concurrent sentencing, and thus his sentence of four years of probation is unchanged.

17

## B. Arson

The Defendant contends that the evidence is insufficient to sustain his conviction for arson because he was not the only one who stood to gain from the fire, the burn pattern did not prove arson, and the presence of mineral spirits on a portion of the hardwood floor was inconsequential without a comparison sample. The State counters that the record is sufficient to support his conviction. We agree with the State.

As it relates to the present case, a person commits arson who "knowingly damages any structure by means of a fire or explosion" and "[w]ithout the consent of the persons who have a possessory, proprietary or security interest therein." T.C.A. § 39-14-301(a)(1).

The evidence, viewed in the light most favorable to the State, proved that the Defendant and the church had argued over possession of his home and had recently entered into a agreement wherein the Defendant would have to sell the house and might recover some profit depending on the amount received for the sale of the home. Thereafter, the Defendant obtained an insurance policy which did not list the church as the beneficiary as required by the settlement agreement. The Defendant went to the Holmouth House after work on December 5, 2011. He placed wood, a fire starter, and a fire starting gel in his fireplace. The Defendant placed his dogs, usually kept inside, outside the home, locked both the front and the back doors, and left. Investigators found the wood in the fireplace unburned and the firebox cool to the touch. Behind the Defendant's couch, investigators found a flammable liquid on the hardwood floor. Experts testified that mineral spirits cured out of hardwood in hours after the wood was treated. The flammable liquid created a burn pattern indicative of arson. Further, there was deep charring on the floor by the fireplace and the back of the sofa indicating that the area with the flammable liquid was where the fire originated. Investigators eliminated electricity, smoking and weather as a cause of the ignition of the flammable liquid. Based upon this evidence, a rational jury could conclude that the Defendant committed arson.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we vacate Defendant's conviction for filing a false insurance claim and dismiss that charge. We affirm the Defendant's conviction for arson.

_____
ROBERT W. WEDEMEYER, JUDGE

18